DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@workandwage.com
Amanda E. Ulrich, Esq. (ISB No. 7986)
aulrich@workandwage.com
Ryan S. Dustin, Esq. (ISB No. 8683)
rdustin@workandwage.com
CASPERSON ULRICH DUSTIN PLLC
356 W. Sunnyside Rd., Suite B
Idaho Falls, ID 83402
Telephone: (208) 524-0566
Facsimile: (208) 745-2523

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
IN THE DISTRICT OF IDAHO

| | |
|---|---|
| CECILIA AVILA,<br><br>                Plaintiff,<br><br>v.<br><br>IDAHO KIDNEY CENTER - BLACKFOOT, LLC, a Delaware limited liability company; LIBERTY DIALYSIS GROUP, LLC, a Delaware limited liability company; and FRESENIUS MANAGEMENT SERVICES, INC., a Delaware corporation; FRESENIUS USA, INC. D/B/A FRESENIUS MEDICAL CARE NORTH AMERICA, a Massachusetts corporation;<br><br>                Defendants. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Filing Fee: $400.00 |

Plaintiff, Cecilia Avila ("Plaintiff" or "Avila"), by and through her counsel of record, Casperson Ulrich Dustin PLLC, and as a cause of action against Defendants Idaho Kidney Center - Blackfoot, LLC, a Delaware limited liability company; Liberty Dialysis Group, LLC, a Delaware limited liability company; Fresenius Management Services, Inc., a Delaware corporation; and Fresenius USA, Inc. d/b/a Fresenius Medical Care North America, a Massachusetts corporation, complains and alleges as follows:

1 - COMPLAINT AND DEMAND FOR JURY TRIAL

**JURISDICTION AND VENUE**

1. This is an action brought under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e; the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12101, *et seq.*; the Idaho Human Rights Act, § 67-5901, *et seq.;* and 42 U.S.C. § 1981.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f)(3), 42 U.S.C. § 12117, and 42 U.S.C. § 1981.

3. This court has pendent jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367 because there is a common nucleus of operative facts as to Plaintiff's federal and state claims.

4. Venue in this action properly lies in the United States District Court for the District of Idaho, Eastern Division, pursuant to 28 U.S.C. § 1391(b) because the claims arose in this judicial district; and venue also properly lies in this district pursuant to 42 U.S.C. § 2000e-5(f)(3) and 42 U.S.C. § 12117 because the unlawful employment practices were committed in this judicial district.

**PARTIES**

5. Avila is a female citizen and resident of the United States, who is, and was at all times relevant to the Complaint, a resident of Bannock County, Idaho.

6. Defendant Idaho Kidney Center-Blackfoot, LLC ("IKC") is a Delaware limited liability company with its principal place of business in Bingham County, Idaho.

7. Defendant Liberty Dialysis Group, LLC ("LDG") is a Delaware limited liability company which does business in the State of Idaho.

8. Defendant Fresenius Management Services, Inc. ("FMS") is a Delaware corporation which

does business in the State of Idaho.

9. Defendant Fresenius USA, Inc. doing business as Fresenius Medical Care North America ("FMCNA"), is a Massachusetts corporation which does business in the State of Idaho.

10. Hereinafter, IKC, LDG, FMS, and FMCNA are referred to collectively as "Fresenius" or "Defendants."

11. At all times material to this Complaint, Defendants constituted joint employers or a single employer of Plaintiff.

12. At all times relevant to this Complaint, Defendants regularly employed fifteen or more persons and were engaged in an industry affecting commerce, bringing Defendants within the ambit of 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 12101, *et seq.*

## FACTS COMMON TO ALL COUNTS

13. Avila realleges paragraphs 1 through 12 as if fully incorporated herein.

14. Avila is Latina and is of Mexican heritage.

15. In or around June 2018, Avila was hired by Fresenius as a registered nurse ("RN").

16. Though Avila made it clear during her interview that she was interested in the acutes position in Pocatello, she was told that she was needed more in Blackfoot because she was bilingual and would be required to work in the Blackfoot location.

17. When she began working for Fresenius, Avila was informed that she would be working in the Blackfoot location as an RN in dialysis and that she would need to go through an initial three month training period where she would first learn to perform dialysis technician work before transitioning into a clinical RN role.

18. Avila began working at the Blackfoot facility, having been told that she would be moved into the acutes position once her training was done at the Blackfoot facility.

19. Within a few weeks of starting work in Blackfoot, there was an incident in which one of Avila's male coworkers brushed against her buttocks. The action seemed unintentional on the part of the male coworker, but afterward, the male coworker would not stop making comments about it, and would say things like "I like big butts."

20. Avila asked the male coworker to stop, but he did not take Avila seriously. Avila spoke with clinical manager Wendy Casper ("Casper") and asked her, confidentially, if she would speak with the male coworker about it.

21. Casper had apparently already had issues with the male coworker, in part due to some mental health issues he had. Casper directed Avila to write a letter so she could get him fired.

22. Avila told Casper she did not want the male coworker fired at all, but that she just wanted the comments to stop.

23. Avila subsequently wrote an email explaining the situation, but made it clear that she did not think the issue was worthy of terminating the male coworker's employment.

24. When Avila returned from an out-of-office training in the late summer/early fall of 2018, everyone at the clinic was talking about her male coworker's comments and the email Avila had sent, and laughing about it.

25. Avila reminded Casper that she had asked that Casper keep the situation confidential. Casper claimed that everyone else in the clinic had asked about it.

26. Casper also made comments openly in a meeting with the Blackfoot clinic's staff that the male coworker had gone "psycho" and stated that "if anyone ever came to work to shoot us all," it would be him.

27. Avila told Casper her comments were not appropriate, especially given the male coworker's history of mental illness. Casper ignored Avila's statement and continued the meeting.

28. After Avila complained to Casper about her lack of confidentiality and inappropriate comments about the male coworker's mental health status, Casper was hostile toward Avila.

29. When Avila asked Casper about getting trained as an RN (the position which she had been hired) instead of being kept in the tech position (which Avila should have been moved out of after three months), Casper would tell Avila that Fresenius really needed to keep her as a tech.

30. Avila had been asked by the director of acutes in Pocatello to come train in acutes so that Avila could eventually transfer to an acutes position. When Avila asked Casper about acutes training and an eventual transfer to acutes, Casper was furious, and told Avila, "If I don't let you go, you can't leave."

31. Casper was also extremely verbally abusive to Avila at a company groundbreaking party in late November/early December 2018, for Fresenius's new facility in Pocatello. The abusive conduct occurred in front of Avila's coworkers, as well as her husband and children, and resulted in Avila being in tears.

32. Avila reported Casper's abusive conduct to Joel Groom ("Groom"), the district manager. Groom stated that he would speak with Casper, and get Avila moved into the acutes position, possibly as early as December.

33. Because Avila was bilingual, she often spoke Spanish with Spanish-speaking patients who did not have a good grasp of English or spoke no English at all. Avila did so in order to ensure that those patients received the best level of care possible. Avila had observed that when patients who do not speak much English are asked questions or provided care instructions in English, they tend to nod or say yes without actually processing or fully understanding the question or instruction.

34. After the company Christmas party in 2018, Casper informed Avila that Casper no longer wanted Avila speaking Spanish with Spanish-speaking patients because "other patients think you are talking about them."

35. Avila explained to Casper that she had concerns about patient care, and that the Spanish-speaking patients may have the same thoughts from other people talking about them in English.

36. There was one dialysis patient who had a few issues with his treatment plan that Fresenius needed to resolve. Avila explained to Casper that she needed to speak Spanish with that patient for patient care purposes, and that she would not stop speaking Spanish with him, or any other patient, due to patient care and patient safety concerns.

37. Casper responded that if the patient did not want to comply with Fresenius's treatment plan, then "he can go back to Mexico." Casper made the comment that this particular patient could "go back to Mexico" on several different occasions.

38. Casper also openly made comments that she "hated" that people who were "illegal" received free medical services, that they felt "entitled" and somehow believed they had a right to complain about their care, even though, according to Casper they owed the company hundreds of thousands of dollars.

39. Avila found Casper's comments and conduct extremely offensive and inappropriate. Avila complained to one of her Latina coworkers about Casper's comments. Her coworker expressed that she understood her concerns about Casper's comments, but that there was nothing either she or Avila could do about it.

40. Avila was afraid to report Casper's comments to anyone higher up at the time because she had seen the lengths Casper had already gone to try to get someone fired when she had

previously targeted Casper's male coworker for termination.

41. On or around December 10, 2018, Avila injured her back while filling in for another nurse at Fresenius's Pocatello clinic.

42. Avila injured her back while lifting the patient. Avila filed a worker's compensation claim, and her doctor provided a note to Fresenius that Avila was not to engage in any bending, twisting, or turning at work, and also provided a lifting restriction.

43. Despite the restrictions directed by Avila's doctor, Casper continued to schedule Avila as a tech, even though she had been hired as an RN, scheduling Avila for excessively long shifts, and not making any accommodations for Avila's restrictions that were workable.

44. Instead of being able to comply with her restrictions, Avila ended up having to perform her normal job duties in violation of her doctor's orders.

45. Casper continued to schedule Avila as a tech and ignore Avila's doctor's orders throughout December 2018, and January and February 2019. Because Casper would not implement the restrictions directed by Avila's doctor, Avila reinjured her back in January 2019 when lifting a patient with a coworker.

46. Avila spoke with Casper about moving to the RN position for which Avila was hired on numerous occasions, and asked Casper to more evenly distribute the lengthy shifts for which she was scheduling Avila, since there were several other employees who could do that work.

47. Casper refused, stating she would not do that because Avila's coworkers had children for whom they needed to be home. Avila explained (and Casper already knew) that Avila had four young children at home.

48. Casper then told Avila she was being selfish for asking, that her coworkers had seniority, that Avila needed the training even though the newer techs had less experience than Avila, and

that Avila's coworkers did not want to cover the shifts, so there would be no further discussion.

49. Avila reported the multiple discriminatory and retaliatory actions Casper took against her to HR on multiple occasions.

50. HR stated they would address the issues (except for any issues related to the sexual harassment allegations/inappropriate comments about disability related to Avila's male coworker because HR was afraid Casper would retaliate against her). Things would improve for a short while after talking to HR, but then the work environment would become hostile again.

51. Avila also reported Casper's conduct to Groom.

52. Despite Avila's reports, Casper's conduct did not stop. Casper continued to schedule Avila as a tech, and required her to work far longer hours than others at the clinic. She also required Avila to work on Saturdays to do charting and did not schedule any other employees to work on Saturdays.

53. Casper also required Avila to do dialysis water work, which required very specific training that Avila had not completed. Casper directed Avila to perform the dialysis water work by herself, even though she did not have the training, it was very dangerous for patients, and it violated Medicare and Medicaid rules and state law.

54. When Avila told Casper she could not do the dialysis water work for those reasons, Casper verbally attacked Avila and accused Avila of not fulfilling her job duties. Casper drove Avila to tears.

55. After that incident, Avila called HR and explained that Casper was causing her to go home in tears virtually every day, that Avila had not been put in the job she had been promised

when she was hired, that Casper had denied her transfers, and that Avila could simply not take the hostile work environment anymore. HR informed Avila that they would speak with Casper.

56. Shortly thereafter, Avila received a call from Groom in which he stated he was moving Avila out of the Blackfoot clinic with Casper and into acutes. He also stated Avila would be getting a raise of $3.00 to $4.00 per hour, and that Avila would be full time in acutes.

57. Avila began training in acutes, but did not receive the raise she was promised. Avila asked her new supervisor, Mia, if she knew why Avila was not given a raise as promised. Mia spoke with Groom, who apparently told Mia that Avila would only get paid more when she "floated," and claimed he never said Avila would be full time.

58. Instead of putting Avila in acutes full time as he had stated he would in response to Avila's complaints of Casper's discriminatory and retaliatory conduct, Fresenius hired a different nurse for acutes, and Avila was told she would have to remain in the Blackfoot clinic under Casper because she spoke Spanish and could translate for Spanish-speaking patients. This reasoning was nonsensical, since Avila had been specifically told by Casper that she was not allowed to speak Spanish to the patients.

59. Because of the hostile work environment created by Casper and the lack of promised promotions, Avila could not return to the Blackfoot clinic. It made Avila physically sick to think about returning to work under Casper. Consequently, Avila contacted Casper and let her know that she had no choice but to resign. Avila resigned in June 2019.

60. Avila contacted HR and members of upper management, providing them with an email explaining that she had to resign due to the discriminatory conduct and hostile work environment she experienced with Casper. Avila also explained that she had contacted HR

about these issues on multiple occasions but nothing had been done to fix the issues.

61. Avila was eventually contacted by one of the doctors who ran the clinic, who wanted to know why Avila left. After Avila explained the situation, the doctor told Avila he believed she had been discriminated against, that he was very sorry, and that he would make sure the Blackfoot clinic took classes to reduce the risk of what happened to her from happening to other employees in the future.

62. On or about October 29, 2019, Avila filed a Charge of Discrimination with the Idaho Human Rights Commission, which was dually filed with the Equal Employment Opportunity Commission ("EEOC").

63. Avila received her Notice of Right to Sue on or about September 21, 2020. Avila has exhausted her administrative remedies.

## COUNT I
## VIOLATION OF TITLE VII/IDAHO HUMAN RIGHTS ACT
(Hostile Work Environment)

64. Avila realleges and incorporates by reference paragraphs 1 through 63 above, as though fully incorporated herein.

65. Avila is of Mexican origin (Latina) and therefore belongs to a protected class under Title VII of the Civil Rights Act of 1964 and the Idaho Human Rights Act.

66. Avila at all times performed her job satisfactorily.

67. Avila's immediate supervisor, Casper, subjected Avila to offensive comments about her race/national origin and hostile treatment due to her race/national origin.

68. Avila reported this conduct to her upper level supervisor and HR and asked that something be done to stop the conduct. However, the conduct did not stop.

69. Avila was subjected to this conduct during nearly the entirety of her employment with Fresenius.

70. Casper's conduct and comments were unwelcome.

71. Casper's conduct and comments were sufficiently severe and pervasive so as to alter the terms and conditions of Avila's work environment so as to create an abusive and hostile work environment.

72. Avila perceived the work environment to be abusive, hostile and/or offensive.

73. A reasonable person of Avila's race/national origin would consider the working environment to be abusive, hostile, and/or offensive.

74. As a direct and proximate result of Fresenius's actions and/or failure to act, Avila has suffered and will continue to suffer emotional distress consisting of outrage, shock and humiliation based upon the racial/national origin discrimination she experienced. Further, Avila has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Avila is therefore entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to her.

75. Fresenius's conduct was malicious and done with reckless indifference to Meza's federally protected rights. Consequently, Plaintiff is entitled to punitive damages pursuant to 42 U.S.C. § 1981a.

## COUNT II
## VIOLATION OF TITLE VII/IDAHO HUMAN RIGHTS ACT
(Race/National Origin Discrimination)

76. Avila realleges and incorporates by reference paragraphs 1 through 75 above, as though fully incorporated herein.

77. Avila is of Mexican origin (Latina).

78. Avila was performing her job according to Fresenius's legitimate expectations.

79. Avila suffered adverse employment actions when Fresenius refused to put her in the RN position for which she was hired, refused to put her into the full time acutes position she was promised, refused to implement the raise Avila was promised, refused to allow Avila to allow her to transfer to a facility other than Blackfoot because she spoke Spanish, and constructively discharged Avila.

80. Avila suffered such adverse employment actions because of her race/national origin.

81. As a direct and proximate result of Fresenius's actions and/or failure to act, Avila has suffered and will continue to suffer emotional distress consisting of outrage, shock and humiliation based upon the racial discrimination she experienced.  Further, Avila has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.  Avila is thereby entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to her.

82. Fresenius's conduct was malicious and done with reckless indifference to Avila's federally protected rights.  Consequently, Avila is entitled to punitive damages pursuant to 42 U.S.C. § 1981a.

## COUNT III
## VIOLATION OF TITLE VII/ IDAHO HUMAN RIGHTS ACT
(Retaliation)

83. Avila realleges and incorporates by reference paragraphs 1 through 82 as though fully set forth herein.

84. Avila engaged in protected activity by complaining about and objecting to comments and conduct in the workplace which violated Title VII and the Idaho Human Rights Act.

85. In spite of such complaints and objections, Fresenius retaliated against Avila by taking adverse employment actions against her, including but not limited to, refusing to put her in the RN position for which she was hired, refusing to put her into the full time acutes position she was promised, refusing to implement the raise Avila was promised, refusing to allow Avila to allow her to transfer to a facility other than Blackfoot because she spoke Spanish, and constructively discharging Avila.

86. As a direct and proximate result of Fresenius's actions and/or failure to act, Avila has suffered, and will continue to suffer, a loss of earning, employment benefits, and job opportunities. Avila is therefore entitled to damages in an amount to be proven at trial, as well as any equitable remedies available to her.

## COUNT IV
## VIOLATION OF 42 U.S.C. § 1981

87. Avila realleges and incorporates by reference paragraphs 1 through 86 above, as though fully incorporated herein.

88. Fresenius's discrimination against Avila is in violation of her rights afforded by the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

89. By Fresenius's conduct, Fresenius intentionally deprived Avila of the same rights as enjoyed by Caucasian citizens to the creation, performance, enjoyment, and all benefits and privileges, of her contractual relationship with Fresenius, in violation of 42 U.S.C. § 1981.

90. As a direct and proximate result of Fresenius's actions and/or failure to act, Avila has suffered and will continue to suffer emotional distress consisting of outrage, shock and humiliation based upon the racial discrimination she experienced. Further, Avila suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Avila is thereby entitled to general and compensatory damages, such amount

to be proven at trial, as well as any other equitable remedies available to her.

91. Fresenius's conduct was malicious and done with reckless disregard for Avila's federally protected rights. Consequently, Avila is entitled to punitive damages pursuant to 42 U.S.C. § 1981.

## COUNT V
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT/IDAHO HUMAN RIGHTS ACT
(Failure to Accommodate/Disability Discrimination)

92. Plaintiff realleges and incorporates by reference paragraphs 1 through 91 as though fully set forth herein.

93. Avila had a disability within the meaning of the ADA/IHRA in that she had, and continues to have, an impairment that impacts her musculo-skeletal system.

94. Avila's disability substantially limits her major life activities and/or major bodily functions, including but not limited to her ability to lift, twist, turn, bend, and work.

95. Avila's disability required that Avila be accommodated by complying with work restrictions implemented by her doctor, including no twisting, turning, bending, and a lifting restriction.

96. Avila was a qualified individual able to perform the essential functions of her job with or without reasonable accommodations.

97. Fresenius failed to accommodate Avila by refusing to comply with her doctor's restrictions, resulting in Avila injuring her back a second time while at work.

98. Fresenius took adverse action against Avila by, among other things, refusing to accommodate Avila, refusing to put her in the RN position for which she was hired, refusing to put her into the full time acutes position she was promised, refusing to implement the raise Avila was promised, refusing to allow Avila to transfer to a facility other than Blackfoot because she spoke Spanish, and constructively discharging Avila.

99. As a direct and proximate result of Fresenius's actions and/or failures to act, Avila has suffered, and will continue to suffer, a loss of earnings, employment benefits, and job-related opportunities. Avila is therefore entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to her, including reinstatement.

## COUNT VI
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT/ IDAHO HUMAN RIGHTS ACT
(Retaliation)

100. Avila realleges and incorporates by reference paragraphs 1 through 99 as though fully set forth herein.

101. Avila engaged in protected activity by complaining about and objecting to comments and conduct in the workplace which violated ADA and the Idaho Human Rights Act.

102. In spite of such complaints and objections, Fresenius retaliated against Avila by taking adverse employment actions against her, including but not limited to, refusing to put her in the RN position for which she was hired, refusing to put her into the full time acutes position she was promised, refusing to implement the raise Avila was promised, refusing to allow Avila to allow her to transfer to a facility other than Blackfoot because she spoke Spanish, and constructively discharging Avila.

103. As a direct and proximate result of Fresenius's actions and/or failure to act, Avila has suffered, and will continue to suffer, a loss of earning, employment benefits, and job opportunities. Avila is therefore entitled to damages in an amount to be proven at trial, as well as any equitable remedies available to her.

**ATTORNEY'S FEES**

104. As a further direct and proximate result of Defendants' actions and/or failure to act, Avila has been compelled to retain the services of counsel, and has incurred and will continue to incur costs and attorney's fees. Avila is therefore entitled to attorney's fees and costs incurred in pursuing this action pursuant to 42 U.S.C. § 2000e-5(k); 42 U.S.C. § 12205; and 42 U.S.C. § 1988. Avila is entitled to an award of her attorney's fees and costs in this matter in an amount to be determined upon judgment.

**DEMAND FOR JURY TRIAL**

Avila demands trial by jury as to all issues triable to a jury in this action.

**PRAYER FOR RELIEF**

Avila seeks the judgment of the Court against Defendants as follows:

1. For general and compensatory damages, and all other statutorily available damages, in an amount to be proven at trial;

2. For liquidated damages;

3. For punitive damages;

4. For any equitable remedies available to her;

5. For statutorily available costs and attorney's fees;

6. For prejudgment interest on all amounts claimed; and

7. For such other and further relief as the Court deems just and proper.

DATED this 15th day of December, 2020.   /s/
　　　　　　　　　　　　　　　　　　　　　Amanda E. Ulrich, Esq.
　　　　　　　　　　　　　　　　　　　　　CASPERSON ULRICH DUSTIN PLLC